IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THEMBI DLAMINI<br><br>        Plaintiff,<br><br>v.<br><br>JUNA G. BABB and MICHAEL J. BABB,<br><br>        Defendants. | Civil Action File No.<br>1:13-cv-02699-WSD |

## DECLARATION OF THEMBI DLAMINI

I, THEMBI DLAMINI, hereby declare:

1. My name is Thembi Dlamini. I am over eighteen years of age and I am competent to testify. I am the plaintiff in the above-captioned matter and have personal knowledge of the matters stated herein. I give this declaration in support of "Plaintiff's Motion for Summary Judgment" in the above-captioned matter.

2. I am a citizen of Mbabane, Swaziland.

3. I currently reside in Decatur, Georgia under a "T" visa, which is a type of visa reserved for victims of human trafficking. My application for a permanent T visa was approved on October 12, 2012.

US2008 5531378 1

4. In April 2005, while I was residing in Mbabane, I learned that Juna G. Babb and Michael J. Babb, defendants in the above-captioned matter, were ministers of a church in the United States and were interested in hiring an African woman to come to the United States to cook for their son's upcoming wedding.

5. In or about that time, a mutual acquaintance set up a meeting between me and Ms. Babb in Mbabane.

6. I met Ms. Babb at a hotel in Swaziland. At this meeting, Ms. Babb told me that she was looking to hire someone to help with her son's wedding.

7. Specifically, Ms. Babb told me that she and her husband were looking to provide African people with positive opportunities and that it would be an especially good opportunity for me to come to the United States to work for them, because then I could earn money to provide to my family.

8. Ms. Babb told me that, if I agreed to work for she and her husband, they would purchase my roundtrip airfare to the United States and would compensate me for the value of my services.

9. Ms. Babb also told me that the job opportunity was for two weeks and that I would be able to return home to Swaziland at the conclusion of the two-week period.

10. I was reluctant to accept Ms. Babb's offer, because, among other things, I had never been on an airplane before and the idea of traveling to the United States scared me.

11. Within a few days of our meeting, however, Ms. Babb called me and reassured me that she only intended for me to come to the United States for two weeks to help with the upcoming wedding.

12. Relying on Ms. Babb's assurances, and believing that I would be able to earn money to help my family, I ultimately accepted Ms. Babb's offer to come to the United States to assist with her son's wedding.

13. After I informed Ms. Babb that I would accept her offer, Ms. Babb helped me obtain a passport and visa and complete all other necessary immigration paperwork. Among other things, Ms. Babb provided me with a letter to give to the Swaziland passport office, money to obtain a visa, and instructions for the visa application and consular approval process.

14. With Ms. Babb's assistance, I obtained the necessary paperwork to travel to the United States from Swaziland.

15. Shortly thereafter, Ms. Babb arranged for the delivery of a roundtrip airplane ticket to me for travel to and from the United States.

US2008 5531378 1

16. On June 12, 2005, I boarded a flight from Johannesburg, South Africa, and I arrived at Hartsfield-Jackson Atlanta International Airport the next day.

17. Ms. Babb met me at the airport and drove me to her and her husband's home in Ellenwood, Georgia.

18. Before arriving at the Babbs' home, however, Ms. Babb instructed me to surrender my passport and return airplane ticket, which I did.

19. When I arrived at the Babbs' home, Ms. Babb showed me the basement of her home, and told me that is where I would be staying. Ms. Babb also told me that the area surrounding her house was dangerous and instructed me never to leave the home. She then left me alone in the basement.

20. The next day, Ms. Babb forced me to take care of her and her husband's grandson.

21. For the two weeks that followed, I continued to provide domestic services at the Babbs' home, even when they left the home to travel.

22. The Babbs returned home from their travels about two weeks after I first arrived in the United States. With my intended departure date back to Swaziland looming, I asked the Babbs about their son's wedding for which I had

US2008 5531378 1

come to work. Ms. Babb informed me that there was no wedding, however, and instructed me that I was to continue to take care of the Babbs' home and grandson.

23. I asked Ms. Babb why she had deceived me, and she responded that she knew that I would not have come to the United States if I had known the truth. Indeed, I would not have come to the United States had I known the Babbs' true intentions.

24. Although I asked Ms. Babb for my passport and return airplane ticket so that I could return to Swaziland anyway, Ms. Babb refused to provide me with the documents and informed me that I would have to purchase a return airplane ticket on my own if I wanted to leave.

25. Ms. Babb made further threats to me as well, telling me, among other things, that I illegally was in the United States without a work permit and could not contact the police without risking deportation and that I could not try to call my family or friends, because the police would monitor the calls and arrest me.

26. Due to the Babbs' threats and deception, I believed I had no other option but to try to earn money to purchase my return ticket to Swaziland by working for the Babbs.

27. In addition to forcing me to take care of their grandson every day, the Babbs ordered me to clean their home, cook their meals, and perform outdoor

manual labor at their home, including digging soil, pulling weeds, and planting vegetables and flowers.

28.     The Babbs also forced me to clean the homes of others and to perform construction work for a company owned or operated by Mr. Babb, including cleaning, removing and installing carpet, removing and installing tiles, painting, and moving furniture and other heavy objects.

29.     While the Babbs claimed I was being paid for my work for them, they provided me little to no pay, even though they often received money for my services. On some occasions, the Babbs claimed they needed to keep the money I allegedly was earning to ensure its safekeeping and thus did not provide any of the money I had earned to me. At other times, the Babbs claimed they were deducting money I allegedly had earned to pay for food for me and other costs associated with my work.

30.     This conduct continued for almost two years.

31.     On a typical day, I would wake up each day around 5:00 a.m., clean the Babbs' home, cook the Babbs' breakfast, and depart with Mr. Babb or Ms. Babb for work outside their home. Once I returned to the Babbs' home, I would prepare dinner and continue cleaning the house or washing laundry. During each

US2008 5531378 1

day, I was provided little or no breaks. In addition, I was not provided time-off for vacation and otherwise was not provided reasonable working conditions.

32. In early 2007, a couple for whom I had worked approached me and asked why I was reluctant to speak to them. In response, I informed them about my desire to return home and how the Babbs had been treating me.

33. The couple appeared shocked to learn of the Babbs' conduct and began to formulate a plan to extricate me from the Babbs' home. Ultimately, they arranged for me to escape the Babbs' custody on or about February 7, 2007 when the Babbs were away from their home.

34. After my escape, I worked with the Federal Bureau of Investigation ("FBI") and U.S. Immigration and Customs Enforcement ("ICE"), which began investigating the Babbs' actions relative to me.

35. On December 2, 2009, the federal government filed an indictment in this Court against Babbs. *See United States v. Juna Gwendolyn Babb and Michael J. Babb*, No. 1:09CR0520-JEC-RGV (N.D. Ga.), Dkt. No. 1, at 11-13.

36. On July 8, 2011, the Babbs reached separate plea agreements with the United States with respect to the claims against them. As part of these plea agreements, the Babbs were ordered to pay restitution to me in the amount of

$25,000. To date, however, I have received only a small fraction of this restitution amount.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April  14 , 2014.

*[signature]*
Thembi Dlamini